Michael J. Boyle, Jr. (SBN 258560)
BRONSTEIN, GEWIRTZ & GROSSMAN, LLC
4200 Regent Street, Suite 200
Columbus, OH 43219
Telephone: (614) 578-5582
mboyle@bgandg.com

Attorneys for Plaintiff
[Additional counsel appear on signature page]

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| TUYET-NHUNG TRAN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>INTEL CORPORATION, LIP-BU TAN, and DAVID ZINSNER,<br><br>Defendants. | **Case No. 5:26-cv-14267**<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Tuyet-Nhung Tran ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' public documents, conference calls and announcements; United States Securities and Exchange Commission ("SEC") filings; wire and press releases published by and regarding Intel Corporation ("Intel" or the "Company"); transcripts of investor conferences; analysts' commentary; and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**<u>NATURE OF THE ACTION AND OVERVIEW</u>**

1. This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Intel securities

between July 23, 2026 and October 29, 2026, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2. Intel designs and manufactures semiconductors. Its Client Computing and Physical AI Group ("CCPG") sells, among other things, the central processing units ("CPUs") used in notebook and desktop personal computers ("PCs"). In the second quarter of 2026, CCPG generated $8.877 billion of the $16.128 billion in revenue that Intel reported, or approximately 55%. Intel uses the term "client" to refer to its notebook and desktop PC business, as distinguished from its data center business, which Intel reports through its Data Center and AI Group ("DCAI"). The total addressable market ("TAM") for a category of products is the size of the overall market for those products, not Intel's share of it; Intel refers to the TAM for PCs as the "client TAM" or the "PC TAM."

3. Throughout 2026, rising prices for memory, a key PC component, threatened demand for PCs. On July 23, 2026, Defendants assured investors that "[t]he client TAM continued to hold up well despite broad component constraints and price inflation," that "[t]he client TAM is unfolding as expected," and that "customers continue to signal a strong and sustainable spending environment." In Intel's quarterly report on Form 10-Q signed that same day, Intel told investors, in its discussion of its client business, that "[m]arket demand exceeded our available product supply in Q2 2026 and YTD 2026 due to industry-wide supply constraints."

4. Eighteen days later, on August 10, 2026, Intel launched a public offering of its common stock, telling investors that "[c]ustomers continue to signal a strong and sustainable demand environment." That same day, Intel "upsized" the offering "to $20 billion from the previously announced offering size of $15 billion" and priced 210,526,315 shares at $95 per share. On August 11, 2026, the underwriters exercised in full their option to purchase an

additional 31,578,947 shares. Intel has reported net proceeds of $22.617 billion from the offering.

5. Defendants' assurances were materially false and misleading. On August 26, 2026, Defendant Zinsner acknowledged that Intel had "made a conscious decision almost at the beginning of the year" because "[w]e kind of saw this coming. We knew that pricing and memory would get to a point where it was going to start to destroy some of the demand on the client side." Even then, Zinsner described the weakening of the client business as "pretty much expected" and as "probably the best thing we could have, given the data center demand," without disclosing the extent or trajectory of that weakening. At the same conference, Zinsner disclosed that Defendant Tan was personally serving as Intel's "interim sales leader."

6. On October 29, 2026, after the market closed, Intel revealed the truth. Defendant Tan disclosed that "[i]n recent weeks, our customers began signaling a PC slowdown based on memory prices and availability," and that "[t]he pace of the PC correction has accelerated over the last 2 months, as our OEM partners are aggressively managing inventory to match the softer sell thru." Defendant Zinsner admitted that pressure on the PC market "intensified during Q3, particularly late in the quarter, and resulted in a meaningful adjustment in customer purchasing patterns"; that Intel now expected 2026 "second-half units down more than 20 percent"; and that Intel expected CCPG revenue "to decline greater than 20% percent [sic] sequentially" in the fourth quarter of 2026. Intel guided fourth-quarter 2026 revenue to a range of $15.0 billion to $16.0 billion and non-GAAP earnings per share ("EPS") to $0.25, against analyst expectations of approximately $17.08 billion in revenue and $0.43 in EPS.

7. On this news, Intel's stock price fell $26.31 per share, or 28.6%, from a closing price of $92.07 per share on October 29, 2026, to close at $65.76 per share on October 30, 2026, on volume of 455,599,430 shares.

8. Throughout the Class Period, Defendants made materially false and/or misleading statements, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading

statements and/or failed to disclose that: (i) Defendants had known since approximately the beginning of 2026 that memory pricing would "destroy some of the demand on the client side"; (ii) Defendants had already shifted CPU supply away from the client business in anticipation of that demand destruction; (iii) as a result, the client market was not "hold[ing] up well" or "unfolding as expected" in the manner Defendants represented; (iv) during the third quarter of 2026, demand for Intel's client products declined and Intel's OEM customers began a significant adjustment of their purchasing and inventory levels; and (v) as a result, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis at all relevant times.

9. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

10. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

11. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

12. Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391(b). Intel maintains its principal executive offices at 2200 Mission College Boulevard, Santa Clara, California 95054, which is situated in this District, and a substantial part of the acts and omissions giving rise to the claims alleged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in substantial part in this District.

13. In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to the United States mails, interstate telephone communications, and the facilities of a national securities exchange.

14. Divisional Assignment. This action is a securities class action. Pursuant to Civil Local Rule 3-2(c) and the Court's Assignment Plan (General Order No. 44), securities class actions are assigned on a district-wide basis.

## PARTIES

15. Plaintiff Tuyet-Nhung Tran resides in Ellicott City, Maryland. As set forth in the accompanying certification and Schedule A, incorporated by reference herein, Plaintiff purchased Intel common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

16. Defendant Intel is incorporated under the laws of Delaware, with its principal executive offices located at 2200 Mission College Boulevard, Santa Clara, California 95054. Intel's common stock trades on the Nasdaq Global Select Market ("Nasdaq") under the ticker symbol "INTC."

17. Defendant Lip-Bu Tan ("Tan") has served as Intel's Chief Executive Officer ("CEO") since March 18, 2025, and is a member of Intel's Board of Directors. Defendant Tan delivered prepared remarks and responded to analyst questions on Intel's earnings conference calls held on July 23, 2026 and October 29, 2026. Defendant Tan signed, as Intel's Principal Executive Officer, the certifications pursuant to Rules 13a-14(a) and 15d-14(a) under the Exchange Act and 18 U.S.C. § 1350 (the "SOX certifications") filed as Exhibits 31.1 and 32.1 to Intel's quarterly reports on Form 10-Q for the quarters ended June 27, 2026 and September 26, 2026, dated July 23, 2026 and October 29, 2026, respectively. In them he attested, among other things, that "[b]ased on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made . . . not misleading." Defendant Tan also signed, as Principal Executive Officer, Intel's automatic shelf registration statement on Form S-3, filed with the SEC on August 10, 2026, under which the offering described herein was conducted

18. Defendant David Zinsner ("Zinsner") has served as Intel's Executive Vice President and Chief Financial Officer ("CFO") since January 17, 2022. Defendant Zinsner

signed, as Intel's Principal Financial Officer and Principal Accounting Officer, Intel's quarterly reports on Form 10-Q for the quarters ended June 27, 2026 and September 26, 2026. Defendant Zinsner delivered prepared remarks and responded to analyst questions on Intel's earnings conference calls held on July 23, 2026 and October 29, 2026, and spoke on behalf of Intel at the Deutsche Bank 2026 Technology Conference on August 26, 2026. Defendant Zinsner also signed the SOX certifications filed as Exhibits 31.2 and 32.1 to each of those quarterly reports, and signed Intel's Form S-3 registration statement filed on August 10, 2026, both on behalf of Intel and as Principal Financial Officer and Principal Accounting Officer.

19. Defendants Tan and Zinsner are collectively referred to herein as the "Individual Defendants."

20. The Individual Defendants possessed the power and authority to control the contents of Intel's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of Intel's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with Intel, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.

21. Intel is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

22. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to Intel under *respondeat superior* and agency principles

23. Defendant Intel and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

24. Intel reports its results through operating segments that include CCPG, DCAI, and Intel Foundry. CCPG's products include the CPUs Intel sells to original equipment manufacturers ("OEMs") that build notebook and desktop PCs. Within CCPG, Intel separately reports "[c]lient revenue (collectively notebook and desktop)" and "[o]ther CCPG revenue." References herein to the "client market" are to the market for notebook and desktop PCs, and references to "client revenue" are to Intel's notebook and desktop revenue as reported in its periodic filings. In the second quarter of 2026, CCPG reported revenue of $8.877 billion and DCAI reported revenue of $6.262 billion, out of total revenue of $16.128 billion. In the third quarter of 2026, CCPG reported revenue of $8.097 billion and DCAI reported revenue of $7.318 billion, out of total revenue of $16.513 billion.

25. Intel's client revenue growth in the first half of 2026 was driven by price rather than volume. In its Form 10-Q for the quarter ended June 27, 2026, Intel reported that client revenue (notebook and desktop) was $7.7 billion in the second quarter of 2026, up $1.1 billion from the second quarter of 2025, "primarily driven by ASP increases of 27% and 22%" for the quarter and year-to-date periods, respectively, "partially offset by volume decreases of 8% compared to Q2 2025 and 10% compared to YTD 2025." Intel stated that the ASP increases were driven principally by a higher mix of premium products, "with demand-based pricing actions contributing to a lesser extent, in part to offset higher input costs." Defendant Zinsner later acknowledged that, in 2026, "[r]evenue has obviously done better, and we have had some opportunity to do pricing, and that has obviously helped as well."

26. Before the Class Period, Intel acknowledged that rising component prices posed a potential risk to demand. On Intel's April 23, 2026 earnings call for the first quarter of 2026, Defendant Zinsner stated that "constraints and rising prices around key components like memory, wafers, and substrates are driving higher costs that could impact demand for our product at some point in the year," and that "[w]e are prudently planning for PC demand to weaken in the second half of the year."

**Intel's Risk Disclosures Were Generic and Did Not Disclose Known Trends**

27. Intel's Form 10-Q for the quarter ended June 27, 2026 did not set forth risk factors specific to client demand; instead, it incorporated by reference the risk factors contained in Intel's Annual Report on Form 10-K for the fiscal year ended December 27, 2025, filed with the SEC on January 23, 2026 (the "2025 10-K"). Under the heading "Changes in product demand and margins can adversely affect our financial results," the 2025 10-K stated that "we expect the PC TAM to grow over time," and that "[c]hanges in the demand for our products have in the past and may in the future reduce our revenue, lower our gross margin, or require us to write down the value of our assets." Among the "[i]mportant factors that lead to variation in the demand for our products," the 2025 10-K listed "the level of our customers' inventories and computing capacity," "customer order patterns and order cancellations," and "current industry supply constraints for memory chips, substrates and foundry capacity that may impact our customers' abilities to assemble products incorporating our products." The prospectus supplement for Intel's August 2026 common stock offering likewise identified, among a list of general factors that could cause results to differ, "changes in product demand and margins," and referred to "current industry-wide substrate and memory shortages" as a supply chain risk.

28. These disclosures presented the erosion of client demand as a contingency that might occur. The 2025 10-K addressed memory only as a supply constraint, including as something that "may impact our customers' abilities to assemble products," and did not disclose that rising memory prices were reducing end demand for PCs. Intel left these risk factors unchanged in the Q2 2026 10-Q even though, as Defendant Zinsner later acknowledged, Defendants had known since approximately the beginning of 2026 that memory pricing "was going to start to destroy some of the demand on the client side," and had already reallocated CPU supply away from client products in anticipation of that result. A company that describes as merely hypothetical a risk that has already begun to materialize misleads investors.

29. Moreover, Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(b)(2)(ii), required Intel to describe in its periodic reports "any known trends or uncertainties that have

had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Intel's Form 10-Q for the second quarter of 2026 did not disclose the known trend of memory-driven destruction of client demand. Instead, in its discussion of the client business, the Form 10-Q affirmatively represented that market demand "exceeded" Intel's available supply.

**<u>Materially False and Misleading Statements Issued During the Class Period</u>**

30. A statement is misleading if it would give a reasonable investor the "impression of a state of affairs that differs in a material way from the one that actually exists." *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982 (9th Cir. 2008). Having chosen to speak about client demand, the state of the client TAM, and customer demand signals, Defendants were required to speak truthfully and completely about those subjects.

**The July 23, 2006 Second Quarter Earnings Call**

31. The Class Period begins on July 23, 2026. That day, after the market closed, Intel issued a press release reporting its financial results for the second quarter of 2026, which Intel filed with the SEC as Exhibit 99.1 to a Form 8-K. In the press release, Defendant Zinsner stated: "We delivered a strong second quarter, exceeding our financial guidance on robust demand and improved execution, including volume upside driven by higher factory yields and improved cycle times." Defendant Tan stated: "AI is driving unprecedented demand for compute, and as we continue to execute, Intel is well-positioned to capture sustainable growth across our CPU franchise, ASICs, advanced packaging and vast wafer foundry network.".

32. Also on July 23, 2026, Intel held an earnings conference call, during which Defendants Tan and Zinsner delivered prepared remarks that Intel also published on its website. With respect to CCPG, Defendant Zinsner stated:

> ***CCPG revenue was $8.9 billion, up 15 percent sequentially, and better than our expectations. The client TAM continued to hold up well despite broad component constraints and price inflation. Our AI PC revenue grew 26 percent sequentially and now represents two thirds of our client revenue mix.***

33. Defendant Zinsner further stated:

> ***Looking ahead, customers continue to signal a strong and sustainable spending environment driven by the unprecedented demand for AI compute. Industry-wide supply constraints across wafers, memory and substrates remain the dominant challenge our customers are facing to support the AI infrastructure build-out. . . . From an end market perspective, we expect PC consumption to be sub-seasonal in the second half of the year and down low double digits percent for all of 2026, impacted by rising memory prices and constraints. This is in-line with industry peers and 3rd party estimates. At the same time, improving supply, a strengthening product portfolio, and encouraging tailwinds for edge deployments provide us with some positive offsets***.

34. In closing his prepared remarks, Defendant Zinsner stated:

> ***In closing, Q2 was another strong quarter financially and operationally. The client TAM is unfolding as expected and server CPU demand continues to far outpace available supply.***

35. Defendant Tan stated in his prepared remarks that "strong demand for our products continues to outpace our growing supply," and that:

> ***Demand signals from our customers are driving increased confidence, and as Dave will discuss in more detail, we are substantially increasing our investments to support this improving demand outlook***.

36. Defendant Zinsner guided third-quarter 2026 revenue to a range of $15.8 billion to $16.8 billion, with non-GAAP gross margin of 42% and non-GAAP EPS of $0.38 at the midpoint.

37. The statements referenced in ¶¶ 31–36 were materially false and misleading when made because:

(a) The statements that "[t]he client TAM continued to hold up well despite broad component constraints and price inflation" and that "[t]he client TAM is unfolding as expected" were statements of present and historical fact that conveyed that client demand had withstood memory and component price inflation. In truth, as Defendant Zinsner later admitted, Defendants "kind of saw this coming" "almost at the beginning of the year" and

"knew that pricing and memory would get to a point where it was going to start to destroy some of the demand on the client side." Defendants omitted that known trend.

(b) The statements omitted that Intel had already made "a conscious decision" to "shift as much of our supply over to data center as we could possibly get away with" and to "yield a lot of the small core stuff to others," a decision Defendants made because they expected memory pricing to destroy client demand. Having chosen to speak about the strength of the client TAM, Defendants were obligated to disclose the facts that undermined those representations.

(c) The statements omitted that client unit volumes were already declining. Intel's own Form 10-Q, signed the same day, reported client volume decreases of 8% compared to the second quarter of 2025 and 10% compared to the first half of 2025. Client revenue growth was attributable to ASP increases of 27% and 22%, including "demand-based pricing actions . . . in part to offset higher input costs," not to resilient unit demand.

(d) The statement that "customers continue to signal a strong and sustainable spending environment," and Defendant Tan's statement that "[d]emand signals from our customers are driving increased confidence," conveyed that customer demand signals across Intel's business were positive, without disclosing the known adverse trend in client demand described above. Likewise, Defendant Zinsner's statement in the press release that Intel exceeded its guidance "on robust demand" conveyed that demand was robust, without disclosing that client demand was being eroded by memory pricing and that Intel had already shifted supply away from client products.

(e) To the extent the statement that Intel expected PC consumption to be "sub-seasonal in the second half of the year" is deemed forward-looking, it is not protected by the PSLRA's safe harbor because it was not accompanied by meaningful cautionary language identifying the specific, known trend that had already begun to materialize, and because Defendants made it with actual knowledge that it was misleading, as alleged in ¶¶ 78–91 below. Moreover, the statement was embedded in, and inseparable from, the present-tense

representations that the client TAM "continued to hold up well" and was "unfolding as expected."

**The July 23, 2026 Form 10-Q**

38. Also on July 23, 2026, Intel's Form 10-Q for the quarter ended June 27, 2026 (the "Q2 2026 10-Q") was signed by Defendant Zinsner. It was accepted by the SEC's EDGAR system that evening and filed as of July 24, 2026. In its discussion of CCPG revenue, the Q2 2026 10-Q stated:

> ***Client revenue (collectively notebook and desktop) was $7.7 billion in Q2 2026, up $1.1 billion from Q2 2025, and $14.3 billion in YTD 2026, up $1.2 billion from YTD 2025, primarily driven by ASP increases of 27% and 22%, respectively. . . . This increase in client revenue was partially offset by volume decreases of 8% compared to Q2 2025 and 10% compared to YTD 2025. Market demand exceeded our available product supply in Q2 2026 and YTD 2026 due to industry-wide supply constraints. While supply constraints impacted our results during the first half of 2026, we expect these constraints to ease over the second half of 2026.***

39. The statements referenced in ¶ 38 were materially false and misleading when made because:

(a) By attributing the client business's volume declines to supply constraints, and representing that "[m]arket demand exceeded our available product supply," the Q2 2026 10-Q conveyed that client demand was not the limiting factor on Intel's client results. In truth, as alleged above, Defendants knew that memory pricing was destroying client demand, and had deliberately shifted supply away from client products to data center products.

(b) The Q2 2026 10-Q did not disclose, as Item 303 of Regulation S-K required, the known trend that rising memory prices were reasonably likely to materially reduce demand for Intel's client products and, therefore, CCPG revenue. That omission rendered the Q2 2026 10-Q's affirmative statements about client demand and supply misleading half-truths.

(c) The Q2 2026 10-Q's generic risk disclosures, incorporated from Intel's 2025 Form 10-K, presented the risk of declining product demand as a contingency, when that risk had already begun to materialize.

**The August 10, 2026 Offering Materials**

40. On August 10, 2026, Intel filed with the SEC an automatic shelf registration statement on Form S-3, signed by Defendants Tan and Zinsner, and a preliminary prospectus supplement and a final prospectus supplement for an underwritten public offering of its common stock (together with the press releases described below, the "Offering Materials"). The preliminary prospectus supplement incorporated by reference, among other things, the Q2 2026 10-Q and Intel's 2025 Form 10-K. The final prospectus supplement set the public offering price at $95.00 per share for 210,526,315 shares, for an aggregate public offering price of $19,999,999,925 and proceeds to Intel, before expenses, of $19,669,999,926. J.P. Morgan Securities LLC, Goldman Sachs & Co. LLC, Morgan Stanley & Co. LLC, and Citigroup Global Markets Inc. acted as joint book-running managers.

41. Also on August 10, 2026, Intel issued a press release titled "Intel Announces Proposed $15 Billion Common Stock Offering," which Intel later filed with the SEC as Exhibit 99.1 to a Form 8-K. Under the heading "Why Now," the press release stated:

> ***Customers continue to signal a strong and sustainable demand environment, driven by unprecedented investment in AI compute. Progress in emerging areas including physical AI, purpose-built silicon, advanced packaging and external wafers represent significant growth opportunities for Intel.***

42. The press release further stated that "Intel remains disciplined in capital deployment, aligning investments with customer demand and clear return expectations.".

43. Later that day, Intel issued a second press release, titled "Intel Announces Upsize and Pricing of $20 Billion Common Stock Offering," which Intel filed with the SEC as Exhibit 99.2 to the same Form 8-K. It stated that "[t]he offering was upsized to $20 billion from the previously announced offering size of $15 billion," and that the net proceeds would be "approximately $19.7 billion" before any exercise of the underwriters' option. On August 11, 2026, the underwriters exercised in full their option to purchase an additional 31,578,947 shares. Intel's Form 10-Q for the quarter ended September 26, 2026 (the "Q3 2026 10-Q") reports net proceeds of $22.617 billion from the issuance of 242 million shares.

44. The statements referenced in ¶¶ 41–42, and the Offering Materials generally, were materially false and misleading when made because:

(a) The statement that "[c]ustomers continue to signal a strong and sustainable demand environment" was a statement of present fact about the signals Intel was receiving from its customers. It conveyed that Intel's customers, without qualification, were signaling strong and sustainable demand, when Defendants knew that memory pricing was destroying demand from Intel's client customers, the PC OEMs that generated approximately half of Intel's revenue.

(b) The statement that Intel was "aligning investments with customer demand" omitted that Intel had already shifted "as much of our supply over to data center as we could possibly get away with" because Defendants expected client demand to fall.

(c) The Offering Materials incorporated by reference the Q2 2026 10-Q, and were misleading for the reasons set forth in ¶ 39.

(d) The Offering Materials' reference to "changes in product demand and margins" as a factor that could affect Intel's results presented as hypothetical a decline in client demand that Defendants knew had already begun.

**The August 26, 2026 Deutsche Bank Technology Conference**

45. On August 26, 2026, Defendant Zinsner spoke on behalf of Intel at the Deutsche Bank 2026 Technology Conference. The moderator opened by asking Zinsner to discuss the recently completed "historic equity offering," including "what does this say about how you're feeling about the core business at this point?" Defendant Zinsner responded, in relevant part:

> ***Yeah. The capital raise precedes capital investment. . . . We now have confidence in demand. We have confidence in terms of execution, in terms of process. It's the right time to think about increasing capital so that we can make the CapEx investments necessary to take advantage of that growth.***

46. Later, asked to discuss the client business in light of rising memory prices, Defendant Zinsner stated, in relevant part:

> ***Yeah. We made a conscious decision almost at the beginning of the year, really. We kind of saw this coming. We knew that pricing and memory would get to a point where it was going to start to destroy some of the demand on the client side. We are not surprised by this at all. It was pretty much expected. We started to make shifts around, okay, we are going to focus our CPU capacity for client towards the big core type products. We would yield a lot of the small core stuff to others and try to shift as much of our supply over to data center as we could possibly get away with . . . . In reality, the client business weakening was probably the best thing we could have, given the data center demand, because we needed as much to be freed up as possible to meet what's being required***.

47. Defendant Zinsner added:

> ***Clearly, this memory thing is probably going to be a hangover into next year. Again, probably not the worst thing because we're going to need it for the data center side of the business. Eventually, I think it'll snap back as we progress through 2027***.

48. The statements referenced in ¶¶ 45–47 were materially false and misleading when made because:

(a) By characterizing the weakening of the client business as "pretty much expected" and as "probably the best thing we could have," Defendant Zinsner conveyed that the client weakening was consistent with the outlook Intel had provided on July 23, 2026, and was benign to Intel. In truth, as Defendants later admitted, the PC correction "accelerated over the last 2 months" preceding October 29, 2026, and the pressure on the PC market "intensified during Q3, particularly late in the quarter, and resulted in a meaningful adjustment in customer purchasing patterns."

(b) Having chosen to speak about the state of client demand, Defendant Zinsner did not disclose that, as Intel later reported, "demand for our products declined in Q3 2026 as compared to the first half of 2026" in the client market, or that Intel's OEM customers were tightening their inventory management.

(c) Asked directly how Defendants felt about "the core business" in light of the offering, Defendant Zinsner answered that "[w]e now have confidence in demand," without disclosing that demand from Intel's client customers, approximately half of Intel's revenue, was deteriorating.

(d) By describing the effect of memory pricing as "a hangover into next year" that was "probably not the worst thing" for Intel, Defendant Zinsner minimized a deterioration that, within approximately two months, would cause Intel to forecast a sequential decline of more than 20% in CCPG revenue and a decline of more than 20% in second-half 2026 PC units.

(e) Defendant Zinsner did not update or qualify the July 23, 2026 representations that the client TAM was "hold[ing] up well" and "unfolding as expected," even as he acknowledged that Defendants had expected since the beginning of the year that memory pricing would destroy client demand.

**<u>Event Specific Allegations: The PC Correction Accelerated During the Third Quarter of 2026</u>**

49. Defendants' own post-Class Period statements establish that the deterioration of client demand occurred during the Class Period, while Defendants were assuring investors otherwise.

50. In the Q3 2026 10-Q, signed by Defendant Zinsner on October 29, 2026, Intel stated:

> ***In the client market, demand for our products declined in Q3 2026 as compared to the first half of 2026 due to industry-wide impacts from higher component prices, particularly memory, constrained IT budgets and tighter inventory management. We expect these trends to worsen in Q4 2026 and persist in 2027.***

51. The Q3 2026 10-Q further reported that client revenue was $6.9 billion in the third quarter of 2026, "down $424 million from Q3 2025, driven by a 14% decrease in volume due to lower demand and a competitive market environment." Client unit volume thus fell from a decline of 8% year-over-year in the second quarter of 2026 to a decline of 14% year-over-year in the third quarter of 2026.

52. In his prepared remarks for the October 29, 2026 earnings call, which Intel published on its website, Defendant Tan stated:

> ***CCPG: Turning to our client business. In recent weeks, our customers began signaling a PC slowdown based on memory prices and availability. Year-to-date***

> ***system end-point prices have increased significantly placing additional pressure on already limited IT budgets. The pace of the PC correction has accelerated over the last 2 months, as our OEM partners are aggressively managing inventory to match the softer sell thru. We expect the current environment to persist until memory availability and prices begin to normalize***.

53. In his published prepared remarks for the same call, Defendant Zinsner stated:

> ***CCPG revenue was $8.1 billion, down 9 percent sequentially and below our expectations. We previously noted that memory shortages could pressure the second-half PC TAM. That pressure intensified during Q3, particularly late in the quarter, and resulted in a meaningful adjustment in customer purchasing patterns***.

54. In response to an analyst's question during the call, Defendant Zinsner described "this kind of inventory correction," stating: "We're in the throes of that right now. We felt a little bit of it in the third quarter." In response to another analyst, Defendant Zinsner agreed that the fourth quarter of 2026 and the first quarter of 2027 would include "most of the inventory correction, and that impacts us more than the TAM declines.".

55. Defendant Zinsner further stated in his published prepared remarks: "The sequential decline in Q4 gross margin primarily reflects lower overall revenue against our fixed-cost base as we adjust client wafer starts to current demand conditions." In Intel's October 29, 2026 press release, filed with the SEC as Exhibit 99.1 to a Form 8-K, Defendant Zinsner stated: "Looking ahead, we see the PC slowdown continuing at least through the first half of next year."

56. Intel's third fiscal quarter ended September 26, 2026. Accordingly, by Defendants' own account, the pressure that produced "a meaningful adjustment in customer purchasing patterns" intensified within the Class Period, and the acceleration of the PC correction that Defendant Tan described took place within the two months preceding October 29, 2026, a period that includes Defendant Zinsner's August 26, 2026 statements and Plaintiff's purchase of Intel securities.

57. In mid-October 2026, an accident at Intel's manufacturing facility in Kiryat Gat, Israel ("Fab 28") halted manufacturing operations at that facility. Intel attributed approximately $300 million of fourth-quarter 2026 revenue and 200 basis points of fourth-

quarter gross margin to that incident, "almost all" of which Intel stated "is related to 10nm server products." The Fab 28 incident thus accounts for only a portion of the shortfall in Intel's fourth-quarter guidance described below, and does not relate to the client business.

**THE TRUTH EMERGES: DISCLOSURES AT THE END OF THE CLASS PERIOD**

58. On October 29, 2026, after the market closed, Intel issued a press release reporting its financial results for the third quarter of 2026 and providing guidance for the fourth quarter of 2026, and held an earnings conference call. Intel submitted its Q3 2026 10-Q, which was accepted by EDGAR that evening and filed as of October 30, 2026.

59. Intel reported third-quarter 2026 revenue of $16.5 billion, GAAP EPS of $0.60, non-GAAP EPS of $0.52, and non-GAAP gross margin of 44.1%. Although these results exceeded Intel's prior guidance of $15.8 billion to $16.8 billion in revenue, 42% non-GAAP gross margin, and $0.38 non-GAAP EPS, the outperformance was attributable to DCAI, not to the client business. As Defendant Tan explained, "[s]trong momentum in DCAI drove upside," which was "partially offset by weakness in CCPG driven by industry-wide impacts from higher memory prices and limited IT budgets." CCPG revenue was $8.1 billion, "down 9 percent sequentially and below our expectations." DCAI revenue was $7.3 billion, up 78% year-over-year.

60. Intel's fourth-quarter 2026 guidance, compared with analyst expectations, was as follows:

(a) Revenue: guidance of $15.0 billion to $16.0 billion (midpoint $15.5 billion), compared with analyst expectations of approximately $17.08 billion.

(b) Non-GAAP gross margin: guidance of 38.0% (GAAP 37.1%), compared with analyst expectations of almost 43%, and compared with Intel's reported third-quarter non-GAAP gross margin of 44.1%.

(c) Non-GAAP EPS: guidance of $0.25 (GAAP $0.10), compared with analyst expectations of $0.43, and compared with Intel's reported third-quarter non-GAAP EPS of $0.52.

(d) CCPG revenue: Defendant Zinsner stated that Intel expected "CCPG revenue to decline greater than 20% percent [sic] sequentially as customers move quickly to reduce weeks of inventory and align purchases with their expectations for 2027 consumption.".

61. Defendant Zinsner also disclosed that the PC market was "weakening after remaining resilient during the first half of 2026," and that "[w]e expect the 2026 PC unit TAM to decline approximately 12 percent, with second-half units down more than 20 percent." He added that "[f]or 2027, we are planning for the PC unit TAM to decline roughly 10 percent."

62. During the call, an analyst from Melius Research observed that Intel's fourth-quarter revenue guidance was "about $1.8 billion below the Street." Even after excluding the approximately $300 million revenue impact that Intel attributed to Fab 28, the midpoint of Intel's fourth-quarter revenue guidance was more than $1.2 billion below analysts' consensus expectations of approximately $17.08 billion.

63. Defendant Tan acknowledged: "We face near term challenges, including manufacturing supply shortages, the unprecedented memory crunch, and the resulting softness in PC demand."

64. On this news, Intel's stock price fell $26.31 per share, or 28.6%, from a closing price of $92.07 per share on October 29, 2026, to close at $65.76 per share on October 30, 2026, on volume of 455,599,430 shares, more than three times the 134,168,717 shares traded on October 29, 2026. Based on the 5,315 million shares of Intel common stock outstanding as of October 23, 2026, the decline eliminated approximately $139.8 billion of Intel's market capitalization in a single trading day.

## UNDISCLOSED ADVERSE FACTS

65. The market for Intel's securities was open, well-developed, and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose alleged herein, Intel's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired Intel's

securities relying upon the integrity of the market price of the Company's securities and market information relating to Intel, and have been damaged thereby.

66. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Intel's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about Intel's business, operations, and prospects as alleged herein, including that: (i) Defendants had anticipated since approximately the beginning of 2026 that memory pricing would destroy client demand and had shifted supply away from client products accordingly; (ii) client unit demand was declining and client revenue growth depended on price increases; (iii) during the third quarter of 2026, client demand declined further and Intel's OEM customers meaningfully adjusted their purchasing patterns and inventory levels; and (iv) as a result, Intel's client business, and Intel's overall results for the fourth quarter of 2026, were reasonably likely to be materially worse than Defendants' public statements conveyed.

## LOSS CAUSATION

67. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class. *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005).

68. During the Class Period, Plaintiff and the Class purchased or otherwise acquired Intel's securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

69. On October 29, 2026, after the market closed, Defendants disclosed the deterioration in client demand and the OEM inventory correction that their prior statements

had concealed, as alleged in ¶¶ 58–63. On October 30, 2026, the next trading day, Intel's stock price fell 28.6%, on volume of 455,599,430 shares.

70. The decline in Intel's stock price was company-specific and was not caused by market-wide or industry-wide factors. On October 30, 2026, the SPDR S&P 500 ETF Trust, which tracks the S&P 500 index, declined 1.8% (from $769.36 to $755.72), and the iShares Semiconductor ETF declined 8.2% (from $171.29 to $157.17). Although the shares of other semiconductor companies also declined that day, Intel's 28.6% decline was more than twice as large as that of Qualcomm Incorporated (down 11.1%, from $185.41 to $164.79) or Advanced Micro Devices, Inc. (down 10.9%, from $566.42 to $504.80), and more than three times as large as that of the semiconductor ETF.

71. The timing and magnitude of the price decline negate any inference that the losses suffered by Plaintiff and the other Class members were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.

## SCIENTER ALLEGATIONS

72. As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007). The facts alleged herein, considered collectively, give rise to a strong inference of scienter that is cogent and at least as compelling as any opposing inference.

### Defendants Admitted They Anticipated the Destruction of Client Demand From the Beginning of 2026

73. On August 26, 2026, Defendant Zinsner stated that Intel "made a conscious decision almost at the beginning of the year, really. We kind of saw this coming. We knew that pricing and memory would get to a point where it was going to start to destroy some of the

demand on the client side. We are not surprised by this at all. It was pretty much expected." This admission establishes that, when Defendants told investors on July 23, 2026 that the client TAM "continued to hold up well" and was "unfolding as expected," and when Intel told offering investors on August 10, 2026 that "[c]ustomers continue to signal a strong and sustainable demand environment," Defendants had already concluded that memory pricing would destroy client demand.

74. Defendant Zinsner also admitted that Defendants had acted on that knowledge internally, by deciding to "shift as much of our supply over to data center as we could possibly get away with" and to "yield a lot of the small core stuff to others." A deliberate reallocation of manufacturing supply away from a business generating approximately half of Intel's revenue is a decision made by senior management, with knowledge of the demand conditions that prompted it. Defendant Zinsner confirmed the point on October 29, 2026, when he attributed Intel's fourth-quarter gross margin decline to "lower overall revenue against our fixed-cost base as we adjust client wafer starts to current demand conditions."

75. Defendants also knew that Intel's reported client revenue growth depended on price rather than unit demand. The Q2 2026 10-Q, signed by Defendant Zinsner and certified by both Individual Defendants, reported client unit volume decreases of 8% year-over-year, offset by ASP increases of 27%. On August 26, 2026, Defendant Zinsner acknowledged that "we have had some opportunity to do pricing, and that has obviously helped as well."

**Defendant Tan Was Personally Running Intel's Sales Organization**

76. On August 26, 2026, Defendant Zinsner told investors that Intel was "in a transitionary period where our new sales leader, Dean hasn't come on yet, so we're without a sales leader," and that "Lip-Bu right now is actually spending a lot of his time on sales because he is the interim sales leader right now." Defendant Zinsner stated that the new sales leader would be "coming in in September.".

77. Accordingly, during at least part of the Class Period, Defendant Tan personally led Intel's sales function. Upon information and belief, Intel's sales function is responsible for customer orders and customer relationships, including with the PC OEMs whose purchasing

Intel later admitted had undergone "a meaningful adjustment" during the third quarter. As interim sales leader, Defendant Tan had direct access to, and responsibility for, the customer order patterns, OEM inventory levels, and sell-through information that Defendants later cited to explain the PC correction.

**Defendants Touted the Flow of Accurate Information to Senior Management**

78. Defendant Zinsner told investors on August 26, 2026 that Defendant Tan had made transparency a priority: "The third thing he did that I thought was brilliant was he really elevated the need for transparency." Zinsner explained that, before Tan's reforms, "[a] lot of people at one level knew what was going on, and by the time the PowerPoints got modified" for presentation to the CEO, "it was an entirely different story," and that fixing that problem "really has made a lot of difference in the organization." By Defendants' own account, accurate information about Intel's business conditions was reaching Intel's CEO during the Class Period.

**Defendants Had Access to Real-Time Information Regarding Client Demand**

79. Defendants had access to, and monitored, information regarding customer demand. Defendant Tan stated on July 23, 2026 that "[d]emand signals from our customers are driving increased confidence." Defendant Zinsner stated on August 26, 2026 that Intel was "getting good line of sight because of the long-term agreements with customers." On October 29, 2026, Defendant Tan described the specific timing of the change in customer signals, stating that "[i]n recent weeks, our customers began signaling a PC slowdown," and that the correction "has accelerated over the last 2 months." Defendant Zinsner described the pressure as having "intensified during Q3, particularly late in the quarter." Defendants' ability to identify these developments by weeks and months confirms that they received and reviewed timely information regarding customer orders, sell-through, and OEM inventory. Additional facts will be adduced through discovery, including internal communications, customer order and forecast data, OEM inventory and sell-through reports, and sales data available to Defendants.

**The Client Business Was a Core Operation of Intel**

80. CCPG generated $8.877 billion of Intel's $16.128 billion in revenue in the second quarter of 2026 (approximately 55%), and $8.097 billion of Intel's $16.513 billion in revenue in the third quarter of 2026 (approximately 49%). Demand for Intel's client products was thus a matter of such prominence that it would be "absurd to suggest" that Intel's CEO and CFO were unaware of it. *See* Berson v. Applied Signal Tech., Inc., 527 F.3d 982 (9th Cir. 2008). That inference is reinforced by the Individual Defendants' own statements, alleged above, describing the customer demand signals they received, the supply-allocation decisions they made, and Defendant Tan's role as interim sales leader.

**The Temporal Proximity Between the Misstatements and the Admitted Deterioration**

81. Defendants' misstatements were made during the very period in which, by Defendants' own account, the PC correction was underway and accelerating. The August 10, 2026 Offering Materials and Defendant Zinsner's August 26, 2026 statements were made during Intel's third fiscal quarter, which ended September 26, 2026, and during which, as Defendant Zinsner admitted, pressure on the PC market "intensified." Defendant Zinsner's August 26, 2026 statements were made at or near the beginning of the two-month period over which, Defendant Tan admitted, the PC correction "has accelerated."

**The Magnitude and Speed of the Deterioration**

82. The magnitude of the deterioration in Intel's client business supports a strong inference of scienter. Within approximately three months of Defendants' statement that the client TAM was "unfolding as expected," Intel disclosed that it expected 2026 second-half PC units to be "down more than 20 percent," that CCPG revenue would "decline greater than 20% percent [sic] sequentially" in the fourth quarter, that fourth-quarter non-GAAP gross margin would fall to 38.0% from 44.1% in the third quarter, and that fourth-quarter non-GAAP EPS would fall to $0.25, from $0.52 in the third quarter

**Defendants Were Motivated to Maintain the Price of Intel Stock During the Offering**

83. Defendants were motivated to conceal the deterioration of client demand while Intel sold approximately $23 billion of newly issued common stock to the public. Defendant Zinsner explained that one of "the biggest drivers of the capital raise" was that Intel's

investment plans "require[] us to make some commitments to suppliers, and I need to know that we have got the cash to be able to make those commitments." Intel launched the offering on August 10, 2026, eighteen days after the July 23, 2026 statements; touted to offering investors that "[c]ustomers continue to signal a strong and sustainable demand environment"; and the same day "upsized" the offering "to $20 billion from the previously announced offering size of $15 billion." Both Individual Defendants signed the registration statement. Intel received net proceeds of $22.617 billion from shares sold at $95 per share, a price that did not reflect the true condition of Intel's client business. In any event, "[t]he absence of a motive allegation, however, is not fatal." *Tellabs*, 551 U.S. at 325.

**The Individual Defendants' SOX Certifications**

84. Each Individual Defendant certified the Q2 2026 10-Q, attesting that "[b]ased on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made . . . not misleading." Each further certified that he was responsible for disclosure controls and procedures designed "to ensure that material information relating to the registrant . . . is made known to us by others within those entities." Having so certified, the Individual Defendants either knew of the adverse client-demand facts alleged herein or were deliberately reckless in not knowing them.

**Post-Class Period Admissions**

85. Defendants' statements on October 29, 2026 confirm that the adverse facts existed during the Class Period: Intel's client demand "declined in Q3 2026 as compared to the first half of 2026"; pressure on the PC market "intensified during Q3, particularly late in the quarter"; the PC correction "accelerated over the last 2 months"; and Intel "felt a little bit of" the inventory correction "in the third quarter."

**APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)**

86. The market for Intel's securities was open, well-developed, and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Intel's securities traded at artificially inflated prices during the Class Period.

87. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) the omissions and misrepresentations were material;

(c) Intel's securities are traded in an efficient market;

(d) the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

(e) the Company traded on Nasdaq and was covered by multiple analysts;

(f) the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(g) Plaintiff and members of the Class purchased, acquired, and/or sold Intel's securities between the time Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

88. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market. *See Basic Inc. v. Levinson*, 485 U.S. 224 (1988).

89. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## NO SAFE HARBOR

90. The statutory safe harbor provided for forward-looking statements under certain circumstances, 15 U.S.C. § 78u-5, does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein relate to then-existing facts and conditions, including the present state of the client TAM, customer demand signals, and the relationship between client demand and Intel's supply. To the extent

any of the statements alleged to be false may be characterized as forward-looking, they were not identified as forward-looking when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, Defendants are liable for any forward-looking statement pleaded herein because, at the time each such statement was made, the speaker had actual knowledge that the statement was materially false or misleading, and/or the statement was authorized or approved by an executive officer of Intel who knew that the statement was false when made.

## CLASS ACTION ALLEGATIONS

91. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons and entities that purchased or otherwise acquired Intel securities during the Class Period and were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

92. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Intel's common stock was actively traded on Nasdaq. As of October 23, 2026, Intel had 5,315 million shares of common stock outstanding. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds of thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Intel or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

93. Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

94. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

95. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and prospects of Intel;

(c) whether the Individual Defendants caused Intel to issue false and misleading statements during the Class Period;

(d) whether Defendants acted knowingly or recklessly in issuing false and misleading statements;

(e) whether the prices of Intel securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

(f) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

96. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**COUNT I**

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

97. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

98. This Count is asserted against all Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

99. During the Class Period, Defendants engaged in a plan, scheme, conspiracy, and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes, and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Intel securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Intel securities at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

100. Pursuant to the above plan, scheme, conspiracy, and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly reports, SEC filings, press releases, and other statements and documents described above, including statements made to securities analysts and investors, designed to influence the market for Intel securities. Such reports, filings, releases, and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Intel's business, operations, and prospects.

101. By virtue of their positions at Intel, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.

102. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Intel, the Individual Defendants had knowledge of the details of Intel's internal affairs.

103. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Intel. As officers of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Intel's businesses, operations, and prospects. As a result of the dissemination of the aforementioned false and misleading reports, releases, and public statements, the market price of Intel securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Intel's business which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Intel securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities, and/or upon statements disseminated by Defendants, and were damaged thereby.

104. During the Class Period, Intel securities were traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued, or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Intel securities at prices artificially inflated by Defendants' wrongful conduct. Had

Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Intel securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of Intel securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

105. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

106. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and acquisitions of D-Wave securities during the Class Period, upon the disclosure of the truth concerning D-Wave's Bookings, system-sales pipeline, and business prospects.

**COUNT II**

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

107. Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

108. During the Class Period, the Individual Defendants participated in the operation and management of Intel, and conducted and participated, directly and indirectly, in the conduct of Intel’s business affairs. Because of their senior positions, they knew the adverse non-public information about Intel’s client business and customer demand.

109. As officers of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Intel’s financial condition and results of operations, and to correct promptly any public statements issued by Intel which had become materially false or misleading.

110. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press

releases, and public filings which Intel disseminated in the marketplace during the Class Period concerning Intel's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Intel to engage in the wrongful acts complained of herein. The Individual Defendants therefore were "controlling persons" of Intel within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Intel securities.

111. Each of the Individual Defendants, therefore, acted as a controlling person of Intel. By reason of their senior management positions and/or being directors of Intel, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Intel to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of Intel and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

112. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Intel.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class pre-judgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees, and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: November 20, 2026

BRONSTEIN, GEWIRTZ & GROSSMAN, LLC

By: /s/ Michael J. Boyle, Jr.
Michael J. Boyle, Jr. (SBN 258560)
4200 Regent Street, Suite 200
Columbus, OH 43219
Telephone: (614) 578-5582
mboyle@bgandg.com

Peretz Bronstein*
BRONSTEIN, GEWIRTZ & GROSSMAN, LLC
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Facsimile: (212) 697-7296
peretz@bgandg.com

*Pro hac vice application forthcoming

*Attorneys for Plaintiff*